IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| FORREST SCOTT SMART, | CV 24-65-H-DLC |
| Plaintiff, | |
| vs. | ORDER |
| CONNIE WINNER, ET AL., | |
| Defendants. | |

Defendants filed a motion for summary judgment with supporting documents on July 21, 2025. (Doc. 42.) After various delays, the motion is fully briefed. The motion is granted, in part.

## I.    BACKGROUND

The following summary provides background for the analysis of this motion. Additional facts, and any disputes surrounding them, are discussed in greater detail below. The basic timeline of events is not disputed.

Forrest Scott Smart is an inmate at Montana State Prison ("M.S.P."), Deer Lodge, Montana. Smart suffers from several chronic medical conditions and is under the care of M.S.P. Defendant Dr. Paul Rees, as well as medical professionals outside of M.S.P.

On November 30, 2022, Smart submitted a medical care request, asking to be seen. His request stated, "My right testicle has swollen to 3 times its normal

size. The pain shoots into back. I have chills, body aches, fever and have not slept since yesterday." He was seen by Defendant Amanda Womack, a registered nurse, who had treated Smart previously for other conditions, including a urinary tract infection ("UTI"). After her evaluation, including a urine test, Womack again diagnosed Smart with a UTI. She prescribed him antibiotics, and sent urine and blood samples to a lab for confirmation.

Smart stayed in the infirmary for the following couple of days. On December 2, 2022, while still in the infirmary, Smart was examined by Defendant Rees. Rees did not change the diagnosis of a UTI and concluded that Smart's symptoms were resolving. Smart left the infirmary on December 3, 2022.

Dr. Rees examined Smart again on December 8. Rees spoke with Smart's outside treating urologist, Dr. Jonathan Mercer, about an upcoming appointment Smart had with him related to Smart's other urological issues. The doctors agreed that Smart would have a scrotal ultrasound before that next appointment with Dr. Mercer. Rees prescribed Smart more antibiotics and ordered the ultrasound from a mobile imaging company that comes to M.S.P. for that purpose.

On December 14, 2022, Smart was seen again by Nurse Womack for his chronic conditions. Smart was afebrile and stated he was feeling a little better.

On December 27, 2022, Smart's ultrasound was completed. The scan showed no blood flow to Smart's right testicle, consistent with testicular torsion.

2

Smart was taken to the emergency room at Deer Lodge Medical Center ("DLMC"), where another ultrasound was performed. Smart was seen by Dr. Vaughn Johnson at DLMC, who concluded that Smart had right testicular torsion.

On January 3, 2023, Smart was seen by his treating urologist, Dr. Mercer, who ordered yet another ultrasound. On January 4, 2023, Dr. Mercer surgically removed Smart's right testicle, which was no longer viable.

On September 17, 2024, Smart filed his Complaint in this Court. The operative Complaint here is Smart's Second Amended Complaint, filed on May 15, 2025, which asserts an Eighth Amendment denial of medical care claim, a state law negligence claim, a violation of the Montana Constitution's dignity provision, and medical malpractice. (Doc. 34.) Smart asserts his claims against Defendants Connie Winner, Cynthia McGillis-Hiner, Amanda Womack, Dr. Paul Rees, and Lisa Blanche. Smart seeks over $10 million in compensatory and punitive damages.

## II.    ANALYSIS

### A. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(a) entitles a party to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The movant bears the initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputed facts that do not change the Court's analysis under the law may be disregarded.

Once the moving party has satisfied its burden, the non-moving party must go beyond the pleadings and designate by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Id.* at 324. In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007). But "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

**B. Defendants' Motion**

Defendants' motion for summary judgment asserts four grounds: Plaintiff

Smart failed to exhaust his administrative remedies, and thus, his suit is barred by the Prison Litigation Reform Act; Defendants' treatment of Smart was not deliberately indifferent under the Eighth Amendment; Defendants are entitled to qualified immunity; and Defendants Winner, Hiner, and Blanche were not involved in Smart's medical care (Doc. 42 at 2.) Defendants assert that "Smart's state law claims should be dismissed for the same reason as his federal law claims." (Doc. 42 at 2.) The motion is supported by a Statement of Undisputed Facts ("S.U.F."), pursuant to D. Mont. L.R. 56.1(a), and associated exhibits. (Doc. 44.)

Smart filed a response brief with a Statement of Disputed Facts ("S.D.F."). (Docs. 49 and 50.) In his brief, Smart noted the failure of Defendants to provide the *Rand* notice required when a summary judgment motion is filed against a pro se prisoner. (Doc. 50 at 27.) Defendants then filed the notice, approximately five weeks after filing their motion. Smart filed a motion seeking denial of Defendants' summary judgment motion, solely on the grounds of the missing *Rand* notice. That motion was denied, but Smart was given additional time to file any supplemental documents. (Doc. 54.) Smart has not filed any additional materials.

Smart filed a Statement of Disputed Facts that responds to Defendants' Statement of Undisputed Facts, as required by the Local Rule. (Docs. 44 and 51.) However, Smart's "disputed" facts are frequently not disputed based on evidence.

As just one of many examples, Defendants' S.U.F. ¶ 13 states: Urinary Tract Infection "is an infection in any part of the urinary system which includes the kidneys, ureters, bladder, and urethra." (Doc. 44 at 3.) Smart responds: "Disputed, in part: While "UTI is an infection in any part of the urinary system which includes the kidneys, ureters, bladder and urethra," UTIs do not affect the reproductive system: testes and epididymis. They are separate systems." (Doc. 51 at 2.) This is not a proper factual dispute. Smart may dispute what he considers to be the evidentiary implication of a discussion of urinary symptoms, but his claim to a dispute is mislaid, as the original statement included no information either about testicular torsion or Smart's individual case, nor is it supported by evidence in the record. Smart makes this mistake repeatedly in his S.D.F., thus vastly overstating the number of actually disputed facts. *See, e.g.*, Doc. 51 at ¶¶ 7, 9, 13, 15, 16 – 18, 25 – 26, 27, 31, 35, 40, 41, 42, 46, 47, 52, 57. In addition, for several of the facts Smart disputes, he provides no citation to the record or evidentiary basis for his dispute. Or he writes, "undisputed, with caveat," which is apparently just another way to say disputed without evidence. Accordingly, not every fact that Smart has labelled as disputed is accurately considered as such. The specifics of any relevant disputes, when they exist, are discussed below.

### C. Discussion

#### 1. Exhaustion

a. Smart's grievances

Smart has attached his grievances to his brief, though they are easier to read in the attachments to Defendants' S.U.F. (*Cf.*, Doc. 50-1 at 12 - 23 and Doc. 44-7.) Smart's first grievance related to this issue was filed on July 11, 2023. This is the first step of M.S.P.'s grievance procedure, the so-called informal. In it, he described the series of events leading to the loss of his testicle and his emotional difficulties in response. (Doc. 44-6 at 1 – 2.) His requested action was outside mental health treatment, which was denied. (Doc. 44-6 at 1.) The signature on the denial is August 4, 2023, but Smart did not acknowledge receipt of it until August 23.

Smart appealed this denial with a formal grievance, the second step of the process, on August 26, 2023. He again sought outside mental health therapy. (Doc. 44-6 at 3.) This one was returned "not processed," in part, because there was "no informal on file." *Id.* This statement about the lack of informal is incorrect. The request was also rejected substantively, because inmates are not referred to outside mental health therapists. *Id.*

Smart's third attempt is dated September 7, 2023, and explained both his situation with his testicle, and that he had already filed the informal that was improperly disregarded. (Doc. 44-6 at 5.) He again sought mental health treatment by an outside provider. The grievance was again rejected, this time for asking for

7

two resolutions from two departments. This response is also not accurate. Smart said, "unless my testicle can be replaced," he wanted mental health treatment. This was characterized as asking for both surgery and therapy, which does not fairly interpret Smart's intent. Smart was told to start the grievance procedure at the beginning.

Smart's fourth attempt, heeding the direction to start at the beginning, sought, for the first time, "monetary compensation for the actual damages of losing an irreplaceable organ and the resulting sterility." (Doc. 44-6 at 7 (emphasis in original.)) The response is again not processed, this time for being too late, and also for seeking punitive damages, which is against the grievance policy. This response is an incorrect characterization of Smart's request for actual, rather than punitive, damages. The respondent claimed Smart could only seek a staff investigation if the claim is related to staff conduct. *Id.*

Smart's final attempt was again not processed. He was again told he could not request monetary compensation, and that the issue was closed. (Doc. 44-6 at 9.)

b. Analysis

The Prison Litigation Reform Act ("PLRA")'s exhaustion requirement states: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are

8

available are exhausted." 42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). A prisoner must "complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 93 - 97 (2006). Exhaustion is mandatory. *Jones v. Bock*, 549 U.S. 199, 211 (2007). "Exhaustion should be decided, if feasible, before reaching the merits of a prisoner's claim." *Albino v. Baca*, 747 F.3d 1162, 1170 (9th Cir. 2014). As such, the Court will analyze the failure to exhaust defense first.

The defendant bears the burden of proving failure to exhaust. *See Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005). Under the PLRA, prison regulations define the exhaustion requirements. *Jones*, 549 U.S. at 218. Montana State Prison Procedure 3.3.3 governs grievances. (Doc. 43 at 11.) The required process involves four steps: informal resolution, formal grievance, warden appeal, and director appeal. (Doc. 21 at 3.) Only after completing the four steps has an inmate exhausted his administrative remedies.

Defendants state that Smart did not file a grievance until seven months after the surgery removing his testicle, i.e., July 11, 2023, and thus failed to comply with the grievance procedure's five-day deadline. (Docs. 43 at 11 and 44 at 14.) Defendants further assert that Smart has completed the process previously and thus is aware of what is required to exhaust his claim. *Id.* Smart does not dispute that he

did not begin his grievance process until July, 2023. (Doc. 51 at 7.) Smart's response in his S.D.F. regarding this fact is one of the problematic ones described above. He does not dispute the fact, but adds a "caveat," which is a lengthy explanation of all of the grievances he did file. He also states that he "filed a first informal once he began to be aware of the extent of his current and potential future injuries." How he could not have been aware earlier, given his surgery, is puzzling.

When, as here, the defendant initially shows that (1) an available administrative remedy existed and (2) the prisoner failed to exhaust that remedy, then the burden of production shifts to the plaintiff to bring forth evidence "showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014). The prisoner must produce evidence demonstrating that "the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile." *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (internal citations and quotation marks omitted). An administrative procedure is not available, and therefore need not be exhausted, "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross v. Blake*, 578 U.S. 632, 643 (2016).

Smart responds that the grievance system only allows him to request an

10

investigation into staff conduct, which would not provide a remedy for his loss.

(Doc. 50 at 9.) He also claims he could not ask for monetary damages or punitive

damages. (Doc. 50 at 9.) These arguments are drawn directly from the responses he

received on his grievances, if not actually the policy. Smart alleges other obstacles

to his completion of the grievance process, including not obtaining the correct

appeal forms, and not receiving timely responses. He "only asked for the actual

damages allowed by policy," and the denials show that the grievance procedure is

inadequate and futile. (Doc. 50 at 9.)

MSP Operating Procedure 3.3.3(Q) governed "Remedies and Actions

Requested" at the time of Smart's claims. (Doc. 44-5 at 11.) That policy reads, in

part:

> 1. The grievance process will afford a grievant a meaningful remedy
> for valid grievances. The scope of available administrative remedies is
> broad and should be applied on a case-by-case basis. Possible
> remedies include, but are not limited to:
>     a) modification of institutional operation procedures or practice;
>     b) replacement, restoration of, or restitution for personal
> property; and
>     c) other remedies that will meaningfully solve the problem
> presented.
>
> 2. If the action requested violates any of the following criteria the GC
> will return the grievance without processing:
>     a) monies requested:
>         1) Must not be of punitive nature; and
>         2) Cannot exceed the actual financial damages incurred.
>     (Substantiated inmate claims of property loss or damage by
>     staff may be reimbursed by the GC or staff with authority to
>     spend from the assigned budget.)

11

     b) An investigation request is the only acceptable action request regarding all staff conduct claims. Requests for termination, reprimand, and apology letters will not be accepted.

(Doc. 44-5 at 11.)

Neither party analyzed this text in light of the grievances filed by Smart. Smart's claim that only an investigation into staff conduct is allowed is true, if the request is a change in staff conduct. However, his Second Amended Complaint seeks only money damages, and not injunctive relief, so any request for an investigation does not align with what he wants or wanted.

The policy does allow for compensatory damages, or "actual financial damages," but the rest of that provision implies financial loss from lost or damaged property. There is ambiguity in the policy, which was not clarified by Smart's evolving requests for action. Smart's first three grievances sought mental health treatment, which is not allowed under this policy. But Smart's fourth grievance filed a claim for actual money damages for the loss of his testicle; that grievance was not processed. (Doc. 44-6 at 7.) That denial may or may not have been a proper interpretation of the policy.

However, none of that changes the fact that he did not file anything within five days of the most obvious date associated with his claim, the actual loss of his testicle on January 4. Thus, he falls between two stools, so to speak: he has not filed on time, and thus has failed to comply with the policy, yet he argues he

should be excused from doing so because the process would not have given him the relief he seeks in this suit, money damages for the loss of his testicle. (To be fair, he also seeks punitive damages, which are expressly forbidden in the grievance policy.)

*Ross v. Blake*, 578 U.S. 632, 643 (2016), is instructive. There, the Supreme Court reversed a Second Circuit decision that excused a prisoner from failing to exhaust his remedies because he "reasonably—even though mistakenly--thought" that he had. *Ross*, at 637. The Supreme Court relied on the language of the statute and stated "that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account. *See Miller v. French,* 530 U.S. 327, 337 (2000) (explaining that "[t]he mandatory 'shall' ... normally creates an obligation impervious to judicial discretion")." *Ross*, 578 U.S. at 639. The only exception is the one in the language of the statute; there must be an *available* administrative remedy.

Smart argues that there is nothing to replace the loss of an organ, and therefore, exhaustion was either futile or unavailable. (Doc. 50 at 9 – 12.) Nonetheless, he seeks damages in his suit as a second-best option. Thus, though prison administrators could not adequately replace his loss, they may have been able to compensate him. They may not have, or they may have refused to consider the issue, as his eventual confusing grievance results show. But Smart did not

present that request to them within five days of his "grievable incident", and thus failed to comply with the policy's clear requirements. (Doc. 44-5 at 19.)

In his attempt to justify his failure to comply with the five-day deadline, Smart cites a number of cases that do not have precedential authority in this Court. *United Farm Workers of Am., AFL-CIO v. Arizona Agr. Emp. Rels. Bd.*, 669 F.2d 1249 (9th Cir. 1982) discusses exhaustion in an employee context, not in the context of the PLRA. (Doc. 50 at 9.) *Fields v. Fed. Bureau of Prisons*, 109 F.4th 264 (4th Cir. 2024), *cert. granted, opinion rev'd sub nom. Goldey v. Fields*, 606 U.S. 942 (2025), deals with the issue of extending a *Bivens* action to excessive force in federal prisons; there was no holding regarding administrative remedies generally. *White v. Bukowski*, 800 F.3d 392 (7th Cir. 2015), is a Seventh Circuit case that is not binding precedent in this Court when there is Ninth Circuit law on the issue. Finally, Smart cites two Ninth Circuit unpublished district court cases: *Pitre v. Birkholz*, No. 222CV07956VBFMAR, 2023 WL 3432142 (C.D. Cal. Mar. 16, 2023*), report and recommendation adopted,* No. 222CV07956VBFMAR, 2023 WL 6456483 (C.D. Cal. Sept. 29, 2023), and *Washington v. Fresno Cty.*, 2017 U.S. Dist. LEXIS 201912.

None of these cases excuses a late start to the grievance process. Smart knew how to file grievances and eventually did so, too late. Smart has failed to show that an administrative process was unavailable.

## 2. Eighth Amendment Medical Care

Even if Smart's failure to comply with the administrative grievance procedure was excused for ambiguities in the policy or Defendants' incorrect handling of his grievances, Defendants are entitled to summary judgment on Smart's constitutional medical care claim.

Incarcerated individuals have a constitutional right to adequate medical treatment. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). For prisoners serving custodial sentences following a criminal conviction, that right is part of the Eighth Amendment's guarantee against cruel and unusual punishment. *Id.* "[T]o maintain an Eighth Amendment claim based on inadequate medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle*, 429 U.S. at 104). This two-pronged test consists of an objective and subjective element. *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014). The first prong, serious medical need, is objectively shown by demonstrating that "failure to treat the injury . . . could result in further significant injury or cause the unnecessary and wanton infliction of pain." *Id*. (internal quotation marks omitted). The second prong, deliberate indifference, involves a subjective assessment of whether a defendant "knows of and disregards an excessive risk to inmate health or safety." *Id.* (internal quotation marks omitted). "The official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and [] must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1970).

The first step of this analysis, the objective element, is undisputed. As it turns out, Smart suffered a testicular torsion that resulted in the necessary surgical removal of his testicle. Puzzlingly, Defendants question this first step, citing Smart's urologist Mercer's note that he wanted to be sure that the testicle was not just infected and salvageable, but actually non-viable. (Doc. 55 at 8.) The fact that he then, the next day, concluded the testicle had to be removed, shows that his note reflects caution, and not that torsion had not, in fact, occurred. There is no plausible dispute that Smart had a serious need regarding his testicle, given the ultimate result. This is an objectively serious medical need. The crux of the matter, then, is the second step, whether Defendants were deliberately indifferent to his serious medical need.

Defendants' "requisite knowledge of substantial risk is a question of fact subject to demonstration in the usual ways, [which include] inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. Here is where Smart's constitutional claim fails. On November 30, 2022, Defendant Womack diagnosed Smart with a urinary tract infection, based on his symptoms and a urine test. (Doc. 44 at 6 – 7.) Womack had treated

16

him for this condition before, as he had had a confirmed UTI three months earlier. (Doc. 44 at 5.) Smart did, in fact, have a urinary tract infection in November, as confirmed by lab tests. (Id. at 8.) But he also, as it turned out, probably had an undiagnosed torsion. Womack may have failed to diagnose Smart completely, but Smart has not established that she knew of the torsion and disregarded the risk of it to Smart's health. *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 668 (9th Cir. 2021) ("[A] prison official who should have been aware of a medically related risk to an inmate, but in fact was not, has not violated the Eighth Amendment, no matter how severe the risk.") (internal quotation marks omitted); *see also Farmer*, 511 U.S. at 844 (prison official may show they were unaware of a substantial risk by proving "that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.").

Nor is the risk of the torsion obvious, in context. Smart's complex of other urinary conditions, and his previous UTIs, obscured the fact that there was something else going on. Smart may be correct that Womack's initial investigation was inadequate, but that is the standard for medical negligence and not the constitutional standard for an Eighth Amendment violation. The only real factual dispute about what occurred in Womack's examination is whether she palpated Smart's testicle. For purposes of this analysis, assuming she did not, which is what Smart claims, if her failure to examine is "medically unacceptable under the

circumstances and . . . chose[n] in conscious disregard of an excessive risk to [his] health," *Toguchi v. Chung*, 391 F.3d 1051, 1068 (9th Cir. 2004), then deliberate indifference can "manifest[]," *Estelle*, 429 U.S. at 104–05.  However, Womack did not make this medical decision "in conscious disregard of an excessive risk to [Smart's] health," *Toguchi*, 391 F.3d at 1068, as explained above, because she did not actually infer the substantive risk, *see Farmer*, 511 U.S. at 837. She believed Smart had a UTI, as he had before, and to which his chronic conditions made him susceptible, and she treated him for it. She did not infer there was another issue, and her treatment with antibiotics appeared to show rapid improvement. *See Estelle*, 429 U.S. at 106.  ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). Smart must show that Womack

> "*purposefully* ignore[d] or fail[ed] to respond to [Smart's] pain or
> possible medical need. Under this standard, an inadvertent failure to
> provide adequate medical care, differences of opinion in medical
> treatment, and harmless delays in treatment are not enough to sustain
> an Eighth Amendment claim. Even medical malpractice by itself
> would be insufficient to establish a constitutional violation."

*Simmons v. G. Arnett*, 47 F.4th 927, 933–34 (9th Cir. 2022) (internal citations and quotations omitted).

The same analysis applies to Rees' treatment of Smart. By the time Rees saw him in the infirmary two days later, Smart had been diagnosed by Womack with a UTI, was taking antibiotics, was no longer febrile, and was feeling better.

18

(Doc. 44 at 8 – 9.) There was nothing about Smart's condition at that point that would have alerted Rees to Smart's torsion. Thus, he did not disregard a risk he perceived, even if he maybe should have investigated further. Smart was discharged from the infirmary.

Rees examined Smart again on December 8, 2022, including an evaluation of his testicle, but Smart was not reporting any pain. (Doc. 44 at 9.) Rees concluded there was nothing urgent about Smart's situation, but he ordered an ultrasound, in consultation with Smart's treating urologist, in anticipation of an impending appointment. (Doc. 44 at 10.) Unfortunately, according to Smart, at this point, his testicle was already beyond saving; the lack of pain was because it was too late. (Docs. 50 at 18 and 51 at 4.) Thus, by the time Rees saw Smart, Smart's symptoms were even less likely to reveal the risk of torsion, and, from Rees' perspective, Smart was on the mend. Rees was not deliberately indifferent to a serious medical need.

As to Defendants Winner, Hiner, and Blanche, Smart has failed to show they had any involvement with his medical care at all, such that they could be liable for a violation of his Eighth Amendment rights. Winner had retired eight months before Smart's testicular issue arose. (Doc. 43 at 24.) She had no personal involvement in his treatment, as required to state a claim under § 1983. *King v. Atiyeh*, 814 F.2d 565, 568 (9th Cir. 1987) (overruled in part on other grounds). "A

person deprives another of a constitutional right, 'within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" *Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) (internal citations and quotations omitted). Smart's contention, as to both Winner and Hiner, is that they should have had specific prison policies on how to handle testicular torsions. (Doc. 50 at 18 – 19.) But lack of some general policy about how to treat testicular torsion does not reflect deliberate indifferent to a known medical need of Smart. The connection is just too attenuated. The standard for a constitutional violation cannot be that a supervisor must have a policy related to every medical condition that could possibly arise and be aware of every inmate who suffers from that condition. Winner, who was retired before Smart's issues arose, and Hiner, who had no personal involvement in, or knowledge of, Smart's treatment, are entitled to summary judgment.

Likewise, finally, Lisa Blanche, the administrative assistant who scheduled Smart's ultrasound, was not deliberately indifferent to his medical need. Blanche had no knowledge of Smart's condition, nor any medical role in his treatment. Her job was to schedule his ultrasound, which she did. (Doc. 44 at 11.) She had no reason or authority to act any differently than she did; she was not deliberately indifferent to Smart's serious medical need.

20

## III.  CONCLUSION

Plaintiff Smart failed to exhaust his administrative remedies and has failed to demonstrate that there is a genuine issue of material fact that prevents summary judgment on his Eighth Amendment claim. Defendants are entitled to judgment as a matter of law on that claim. The Court declines to exercise its supplemental jurisdiction over the remaining claims in Smart's Amended Complaint, as those are state law claims that require application of state law, in particular, the Montana Constitution.

> "[A] district court "may decline to exercise supplemental jurisdiction" in three specific situations: (1) if the supplemental claim "raises a novel or complex issue of State law"; (2) if the supplemental claim "substantially predominates" over the claims within the court's original jurisdiction; and (3) if the district court "has dismissed all claims over which it has original jurisdiction." In all those contexts, federal law is not where the real action is. So although supplemental jurisdiction persists, the district court need not exercise it: Instead, the court may (and indeed, ordinarily should) kick the case to state court."

*Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 31–32 (2025). The Court declines to exercise supplemental jurisdiction over Smart's state law claims of negligence, medical negligence, and violation of the Montana Constitution.

Accordingly, it is HEREBY ORDERED:

1.  Defendant's motion for summary judgment is **GRANTED, in part**. (Doc. 42.) Summary judgment is granted to Defendants on Smart's Eighth

Amendment medical care claim. Smart's state law claims are **DISMISSED**, without prejudice. All other pending motions are **DENIED**, as moot. The Clerk of Court is directed to close this matter and enter judgment, pursuant to Fed. R. Civ. P. 58.

2.  The Clerk of Court is directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.

DATED this 24th day of October, 2025.

Dana L. Christensen, District Judge
United States District Court